ALONZO PHILLIPS v. MATTHEW GALLAGHER and Another.

August 26, 1898.

No. 11,268.

Political Convention—Nomination of Candidates—Powers.

A political convention for the nomination of candidates, in the absence of statutory regulations to the contrary, has control over its own proceedings; and a majority of the delegates may, if there be no fraud or oppression, control its action, and correct or reverse any action previously taken by it. Unless such convention acts arbitrarily, oppressively or fraudulently in the premises, its final determination as to candidates, or any other question within its jurisdiction, will be followed by the courts.

Same—Irregular Ballot.

The mere fact that in such a convention a person receives a majority of the votes on a ballot taken for the purpose of nominating a candidate does not make him absolutely the party nominee; but the convention, in the absence of fraud or oppression, may declare the ballot irregular, and proceed to the naming of a candidate in such manner as the majority may direct.

Petition in the supreme court by Alonzo Phillips against Matthew Gallagher and William E. Gooding, president and secretary of the Democratic county convention for Hennepin county, and Martin Whitcomb, for an order to compel Gallagher and Gooding to issue to petitioner a certificate of nomination by the convention to the office of sheriff of Hennepin county, or to show cause why petitioner should not have such relief. Defendants answered and Whitcomb intervened, praying that Gallagher and Gooding be commanded to issue their certificate of nomination to him and not

to plaintiff. The matter was referred to a referee to take and report the evidence. On such report the petition was dismissed.

*A. B. Jackson* and *E. R. Lynch,* for petitioner.

The vital question in such a case as this is, how many votes were cast for or against a candidate, or for or against a measure? Allerton v. Hopkins, 160 Ill. 448; Schuler v. Hogan, 168 Ill. 369. Having received the vote of a majority of the delegates, it was not necessary to petitioner's nomination that there should be a formal determination or announcement of the nomination by the chairman of the convention, or by the tellers, or by somebody else. State v. Fagan, 42 Conn. 32; In re Strong, 20 Pick. 484; State v. Circuit Judge, 9 Ala. 338; Mechem, Pub. Off. §§ 208, 209, 212; People v. Kilduff, 15 Ill. 492; State v. Smith, 15 Ore. 98; First v. Stearns, 21 Pick. 148; Wardens v. Pope, 8 Gray, 140; Ex parte Murphy, 7 Cow. 153. Having once been duly elected by a majority of the votes on a fair and legal ballot, petitioner could not be deprived of the result of this election by any subsequent action of the convention. State v. Wadhams, 64 Minn. 318; In re Heacock, 18 Misc. 311; Le Bert v. Shirley, 24 Colo. 269; People v. Board, 10 Misc. 98.

*C. J. Cahaley* and *Ed. A. Stevens,* for defendants and intervenor.

The deliberative actions of a political convention will not be reviewed by the courts. See State v. Kiichli, 53 Minn. 147; Manston v. McIntosh, 58 Minn. 525; Phelps v. Piper, 48 Neb. 724; In re Pollard, 25 N. Y. Supp. 385; In re Redmond, 5 Misc. 369.

Alonzo Phillips was at no time the nominee of the convention, nor was the convention ever notified of his nomination. We do not desire to be understood as contending that an official declaration or notification under all circumstances is necessary in order to complete a nomination, if the convention, by its subsequent act, acquiesces in the result of a ballot, for example, by making no other nomination for such office. Nor would we contend that fraud or unjust actions upon the part of the officers of a convention could or should rob a nominee of his rights, if every action of the convention, in the free exercise of its parliamentary rights, should show its deliberative judgment. But it cannot for a moment be contended in the case at bar that any of the characteristics enu-

73 M.—34

merated existed. When the convention ordered a ballot, it was upon the implied understanding that it should be regular. If it was not regular, then it was void, and therefore was not a ballot.

START, C. J.

The petitioner, Alonzo Phillips, instituted this proceeding against the respondents, Matthew Gallagher and William E. Gooding, as the chairman and secretary, respectively, of a Democratic convention for the county of Hennepin, to compel them to issue to him a certificate of nomination as the party candidate for sheriff. The petition alleged that the petitioner was duly nominated by such convention. The respondents and the intervenor, Martin Whitcomb, denied this allegation, and alleged that Whitcomb and not Phillips was duly nominated as such party candidate.

A referee was appointed to take and report the evidence. The facts, which are admitted, or are sustained by the weight of evidence, as reported by the referee, stating them in the order as they appeared to the convention, are these:

The convention was duly called, and met July 12, 1898. It was duly organized, with Matthew Gallagher as chairman, and William E. Gooding as secretary. There were 486 delegates entitled to vote therein, and each precinct or district was entitled to its full vote, to be cast by the delegates therefrom present when the ballot was taken. Nominations were to be made by ballot, and Messrs. Rea, Foote and Pratt were made tellers. A ballot for a candidate for sheriff was taken, which, up to the time it was declared closed, was regular in all respects. Only two persons were voted for,—Alonzo Phillips and Edward J. Conroy. The tellers, as preliminary to the counting of the ballots, opened and sorted them, so that each teller, when the sorting was completed, had before him on the table a pile of Phillips ballots and a pile of Conroy ballots. Then each teller counted the Phillips ballots before him, and put them in his hat, and placed it on the floor by his side. The Conroy ballots were then counted, and left on the table. The result of the count was 239 votes for each contestant. The Conroy ballots were then recounted, giving him 240 votes.

In the meantime, and for 25 minutes or more, the Phillips ballots

remained on the floor in the hats. The evidence is radically conflicting as to whether there was any opportunity for tampering with the ballots while the hats were on the floor. A recount of the Phillips ballots was then made, and in doing so Mr. Foote counted the ballots that were previously counted by Mr. Pratt, and placed on the floor in his hat. The original count of the ballots in this hat was 73. The recount was 84,—an increase of 11 votes. A recount of the ballots from one of the other hats reduced the original count of 97 to 96 votes, making a net increase of 10. At the conclusion of the last count the apparent result of the ballot was 249 votes for Phillips, and 240 for Conroy; total 489, or 3 votes more than the convention was entitled to cast. The tellers agreed that one of their number (Mr. Foote) might report to the convention that the ballot was invalid, and that another one should be taken. He accordingly reported that the ballot was foul, there being more ballots than there were delegates. No other report was made by the tellers, who then separated, leaving the ballots on the table.

After the tellers so reported, there was great confusion in the convention. Many of the delegates demanded a report of the number of votes received by each of the candidates, which was refused. Several of the delegates then knew informally how the ballot stood. The next orderly proceeding of the convention was a point of order by a delegate to the effect that the tellers having reported the ballot foul, and having made no other report, the convention must proceed to take another ballot. The point was sustained by the chairman, and no appeal from his decision was taken. A motion was subsequently made, put and declared carried by the chairman, to the effect that the convention proceed to ballot for a candidate for sheriff. A division was called for by a delegate, which was ordered, but, for some reason not disclosed, it was not carried into effect; and, without further action as to the nomination of a candidate for sheriff, the convention adjourned to the next day, July 13.

On the afternoon of the second day of the convention, it was learned for the first time that the 3 excess ballots were cast by mistake of a delegate from the Fourth precinct of the Ninth ward, who cast 3 ballots for 3 of his delegation, whom he supposed to be absent but who were in fact present, in line behind him, and each of

whom voted on his own behalf, whereby 9 votes were cast by the precinct, when it was entitled to only 6. This explanation as to the excess ballots was called to the attention of the secretary and several other delegates before any action was taken in the premises by the convention at its session on the second day. A motion at such session was made, put and declared carried, to the effect that the ballot taken the day previous, and all proceedings therein, except the point of order made and the ruling of the chairman thereupon, be declared informal and irregular, and that the convention proceed to another ballot. Thereupon Mr. Conroy was declared the nominee of the convention, but he declined. The intervenor, Martin Whitcomb, was then on motion declared the nominee of the convention for the office of sheriff. The convention adjourned to and convened on July 20, at which session it passed a resolution declaring the intervenor to be the only person nominated by the convention for the office of sheriff, and expressly recognized him as the party nominee, to whom it desired the certificate of nomination to issue, and then adjourned without day.

The evidence discloses for the first time a possible explanation of the apparent increase in the number of Phillips votes in Mr. Pratt's hat. Teller Foote testified that among these ballots was a single one, across the face of which was written the vote of 12 delegates, and he so counted it. On the other hand Teller Pratt testified, in substance, that there was no such ballot among those placed in his hat, but 73 single ballots only; that there was a single ballot for Conroy, on the face of which was written the total vote the precinct was entitled to cast, which he showed to his associates, and the full number of votes indicated was counted for Conroy. If Mr. Pratt is mistaken, and Mr. Foote correct, it is not improbable that the former counted the omnibus ballot as one vote only. If this be so, then the apparent increase of the Phillips votes in the hat is explained, and all inferences of fraud are rebutted.

It is not necessary to a decision of this case to decide which one of the tellers is mistaken; for we assume, for the purpose of this case,—but without so deciding,—that Mr. Phillips received on the first ballot an honest and clear majority of the 486 votes the delegates were authorized to cast.

But the subsequent action of the convention and its officers, whereby the ballot was declared irregular, and a new ballot ordered, must be judged, not by the facts as they have been subsequently ascertained by a judicial trial, but in the light of the facts as they appeared to be at the time the action was taken. So judging the proceedings of the convention and the action of its officers, it must be held that they acted in the premises without fraud or oppression. The then unexplained, questionable character of the first ballot reasonably justified the tellers in concluding that the ballot was not an honest one, and in so reporting to the convention.

We have then for our decision this question: A ballot is taken by a political party convention for the purpose of selecting a nominee for the office of sheriff. The petitioner in fact receives a majority of the votes, but without declaring him the nominee, and on the report of the tellers, the convention, without any fraud or oppression in the premises, declares the ballot irregular, and that another ballot be taken. A third party is then declared by the convention to be its nominee. Is the petitioner legally entitled to the peremptory order of this court directing the officers of the convention to issue to him a certificate of nomination?

The statute (G. S. 1894, § 48) provides that, whenever it shall appear by affidavit presented to any judge of the supreme or district courts that the president or secretary of any convention has failed to make or file any certificate of nomination, such judge shall, by order, direct the person charged with such neglect to perform such duty, or show cause why he should not do so. The proceedings authorized by this statute are summary, and intended to furnish party nominees for office a speedy and adequate remedy for the neglect or refusal of the officers of the convention to issue the necessary certificate of nomination. But, to entitle a party to this remedy, it must clearly appear that he is the party nominee, and legally entitled to have his name placed upon the official ballot as such.

Counsel for the petitioner claim that the rules of law applicable to an election contest must be followed in determining whether the petitioner is in fact and law the party nominee. It is true, as claimed, that, in election contests proper, the vital question is how

many votes were cast for or against a candidate, and that the party actually receiving a majority of the votes is entitled to the office, notwithstanding any act or omission of the election officers.

But such rules have only a limited application to a political convention, which has control over its own proceedings and officers, in the absence of any statutory regulations, and may proceed according to party usages and customs. The questions which such a convention deals with are essentially political, and it would be a menace to the right of the members of a political party to select their own party nominees, and to the respect which should be entertained for judicial tribunals, for the courts to review and reverse the proceedings of a political convention, in the absence of fraud or oppression on its part or of its officers.

The delegates in a nominating convention meet for the purpose of selecting and agreeing upon candidates for office, to be supported by the party. The discharge of this duty involves the exercise of judgment and discretion on the part of the members of the convention, and a majority of them have, in the absence of fraud or oppression, the right to control the action of the convention, and to correct or reverse any action taken by it. Such a convention is a deliberative body, and unless it acts arbitrarily, oppressively or fraudulently, its final determination as to candidates, or any other question of which it has jurisdiction, will be followed by the courts. See State v. Kiichli, 53 Minn. 147, 54 N. W. 1069; Manston v. McIntosh, 58 Minn. 525, 60 N. W. 672; In re Fairchild, 151 N. Y. 359, 45 N. E. 943. Any other rule would be intolerable, and permit the courts to impose upon a party a nominee contrary to the wishes of its members, as finally expressed by their representatives in convention. It follows that the mere fact, if it be one, that the petitioner in this case received a majority of the votes on the first ballot, did not necessarily make him the party nominee; for it was entirely competent for the convention to declare the ballot informal or irregular, and take another. To deny the convention this right would deprive it of the right to deliberate, and correct or reverse its proceedings.

It is urged by counsel that, if a convention may declare a ballot irregular, a defeated candidate for nomination need only wait for

an opportunity when a sufficient number of his opponents are absent for any cause, and then call the matter up and put it to a second vote. If the convention once fully acts as to a particular nomination, and treats the subject as finally closed, by passing to other business without reservation, and the partisans of the defeated candidate afterwards secure a reversal of the action of the convention in the manner suggested, such conduct would be fraudulent and oppressive; and the courts would not be bound to follow the decision, and would correct the injustice. Such was the case of People v. Board, 10 Misc. 98, 31 N. Y. Supp. 112, cited by the petitioner in support of his proposition that the convention had no power to declare the ballot irregular. That was a case where a convention, three days after making a nomination, reassembled and nominated another candidate; and the court (the party which the convention represented having taken no action in the premises) recognized the nomination first made as the legal one. In the case at bar the action of the convention as to the ballot in question was taken while the subject of the nomination of a candidate for sheriff was still pending, and before any final conclusion had been reached.

It is true, as claimed, that the tellers were not authorized to declare the ballot foul, but should have reported the facts, unless there was some party usage to the contrary; yet the fact remains that after hearing the report the convention acquiesced in the chairman's ruling that another ballot was in order, and voted that the ballot was irregular, and that another one be taken, which was done, resulting in the nomination, not of the petitioner, but the intervenor. Such action of the convention was taken without fraud or oppression, and the court will not reverse it.

It is therefore ordered that this proceeding be, and it is hereby, dismissed, and the restraining order vacated.

BUCK, J. (dissenting).

I dissent. The real contest is between two Democrats, each claiming to be entitled to the certificate of nomination for the office of sheriff of Hennepin county. The convention consisted of 486 delegates, and was organized July 12, 1898. There is no contest as to the regularity of the convention, or the eligibility of any

of the delegates. On motion the nominations were made by ballot, and to this end three tellers were duly selected. Upon a ballot having been taken for the nomination of sheriff, the plaintiff, Alonzo Phillips, had 249 votes, and Edward J. Conroy had 240,—a total of 3 votes more than the whole number of delegates. This result was arrived at after 3 examinations and counts of the ballots. These 3 surplus votes, as was shown by ample evidence, were cast by mistake for Conroy. Thereupon Judge Rea, one of the tellers, with the consent of the other tellers stepped to the front of the stage, and announced that the tellers had found that there were 3 more ballots than, according to the secretary's call, had been cast by the delegates, but that one of the candidates had a majority, even taking these 3 extra ballots from his vote. This statement was not contradicted. This majority vote was cast for Phillips. Hence he was then entitled to the certificate of nomination for the office of sheriff. This fact must have been known to all of the tellers.

The rule is well settled that a mere excess of ballots, which may be deducted from the party having the majority, never vitiates the vote, or renders it invalid, where it does not change the result. Evidently this announcement would have been decisive of the whole matter, had not C. M. Foote, another teller (a strong partisan adherent of Conroy, whom he nominated in the convention), discovering the defeat of his candidate, insisted upon reporting to the convention that the ballot was a foul one,—a matter which was neither so in law or fact, as the three surplus votes were cast by mistake, and were for Conroy himself. Viewed from any standpoint, Phillips had a clear legal majority of the votes; and though the tellers absolutely refused to state the facts which in their opinion made it foul, or to state who had a majority of the ballots, yet this could not change the result, because the actual fact must control, and not any announcement, right or wrong, or refusal to make any. Notwithstanding many of the delegates demanded a report of the number of ballots received by each candidate, the tellers persistently refused to give it; and it is easy to read between the lines who controlled this matter, viz. the adherents of Conroy.

In the meantime several of the delegates had ascertained just

how the ballots stood, and disorder and confusion ensued. This can be easily understood. The Phillips men, feeling that their candidate was fairly nominated, naturally persisted in his not being deprived of his rights; and the Conroy men, smarting under the defeat of their candidate, availed themselves of the slightest pretext for having another ballot. The friends of Phillips having learned of the condition of affairs, and that the tellers would not make any official announcement to the convention of the result, Phillips addressed the convention, stating the facts, and requesting his friends to abstain from taking part in any further proceedings on the subject. This took place before further proceedings were had relative to the subsequent nomination of sheriff. Thus, the entire convention had ample notice that Phillips had been fairly, honestly and legally nominated for the office of sheriff by a majority vote of all the delegates in the convention. No further proceedings upon the subject were had until the afternoon of the next day, when the convention, by acclamation, nominated Conroy as a candidate for sheriff, who declined; and thereupon the intervening defendant, Whitcomb, was nominated for that office.

The question then arises whether a person who has once been fairly nominated by a majority in a regularly organized convention, under the present law can be deprived of the result of such nomination by any subsequent action of the convention through parliamentary tactics or arbitrary power, especially where there is no fraud and no mistake as a basis for such subsequent proceedings. I think not. The so-called Australian ballot law was enacted for the purpose of having regularity, fairness, stability and majority rule in our caucuses and conventions, and to be a corrective of irregular and lawless proceedings in such primary assemblages. Its object was to permit the popular will to find a method of expressing itself legally as to who it desired or preferred for candidates to stand for a final test at the polls. Under this law there are only two ways by which a person can be nominated for office, viz. one by petition, and the other by a regularly organized convention.

The law is the guide for this proceeding, and, when the person has followed the law in this respect, it should protect him in the right thus obtained. It may not be a vested right, but it is a valu-

able one. The right to hold the office itself is not a vested one, but it is a right which courts can and do frequently protect. The legislature, in the exercise of its powers, may repeal a law creating an office, even while the incumbent is in the actual possession thereof, and receiving its emoluments, except, perhaps, in the case of a constitutional office. Writs of quo warranto issue to determine such rights, and mandamus to enforce them. The right to a nomination for office is a valuable one, because it is through such nomination, lawfully made, that a person obtains his election to the office. If the candidate is wronged in attempting to secure a nomination, there ought to be a remedy, and courts ought not to wait until the time for redress has passed before determining this right.

Was Phillips wronged by the proceedings or the acts of the convention or its officers? That he was legally and fairly nominated is beyond reasonable controversy. It was not the right or duty of the tellers to announce the ballot a foul one. The evidence shows that it was not such in fact or in law, but a legal, valid one. It was not their business to act as final judges, or as a jury or counsel, except to report the facts; and Foote's announcement that the vote was a foul one could not make it so in fact, when the fact was otherwise. It was the duty of the tellers to have reported the facts, and not their conclusions, or that of any one of them, from the facts. Their duty was purely ministerial, and they had no legal right to usurp the functions of the convention, or destroy the valuable rights of the candidate, no matter whether they acted in good or bad faith. The spectacle of the tellers, and that of the secretary, who had learned of the mistake, in not bringing all of the facts before the convention before the nomination on the second day, is, to say the least, a most extraordinary one. They and many other delegates knew of the great wrong being done to Mr. Phillips. Why was not an investigation then made of this charge that the ballot was a foul one? No one seems to have attempted to ascertain its truthfulness or falsehood, and then to have governed themselves accordingly. An untrue and groundless charge of a foul ballot, without any investigation, was permitted to operate to defeat Phillips' fair nomination to an important and valuable office; and its practical effect was to wrong and injure him in the estima-

tion of his fellow citizens, when in fact there was not the slightest stain of any impure act upon his part, or that of his delegate friends in the convention.

The majority opinion proceeds upon the theory that the subsequent action of the convention and its officers, whereby the first ballot was declared irregular, and a new one ordered, must be judged and determined, not by the facts as they may have been subsequently ascertained by a judicial trial, but in the light of the facts as they appeared to be at the time action was taken. While I do not assent to this broad statement of the law, I ask what facts were subsequently ascertained that justified the application of this rule to this case? The fact that Phillips had a legal majority was known to the convention immediately after the first ballot. The tellers knew it, Phillips stated it to the whole convention, and the secretary knew it; and before the actual nomination he knew how the mistake as to the three ballots occurred. The entire proceeding in regard to the nomination of Phillips, from the time of the first ballot to the nomination of Whitcomb by the friends of Conroy, was not to correct any proceeding through any examination or investigation of the facts, but to defeat Phillips' nomination.

If, as the majority opinion holds, the subsequent action of the convention and its officers, whereby the first ballot was declared irregular, and a new one ordered, must be judged, not by the facts as they may have been subsequently ascertained, but in the light of the facts as they appeared to be at the time the action was taken, then, if there was fraud or mistake or arbitrary proceedings which were not apparent or disclosed, the candidates and convention would be bound by it. If that is to be adopted as a general rule of law, it is one full of danger. I think it pernicious and unsound doctrine. Fraud usually lurks and operates unseen. Mistakes are unknown at the time, and arbitrary power often comes in the guise of professions of good will for the people's rights; but this doctrine prevents a subsequent investigation of such acts, if on the face of the proceedings all is fair at the time the acts were performed, and thus fraud, mistake and arbitrary power may succeed.

It is further said in the majority opinion that

"Such a convention is a deliberative body, and unless it acts arbitrarily, oppressively or fraudulently, its final determination as to candidates, or any other question of which it has jurisdiction, will be followed by the courts.   *   *   *   Any other rule would be intolerable, and permit the courts to impose upon a party a nominee contrary to the wishes of its members, as finally expressed by their representatives in convention.   It follows that the mere fact, if it be one, that the petitioner in this case received a majority of the votes on the first ballot, did not necessarily make him the party nominee, for it was entirely competent for the convention to declare the ballot informal or irregular, and take another.   To deny the convention this right would deprive it of the right to deliberate, and correct or reverse its proceedings."

This opinion concedes that, if the convention acted arbitrarily, the court would have jurisdiction to correct the proceedings and give relief.   That is just what the convention did, and it is this arbitrary act that is complained of, and proven beyond any reasonable doubt.   There was no ground of complaint against Phillips, and, though he was fairly nominated, the convention, not by reason of cause shown, without reconsidering the first ballot, voted on the second day of the convention and nominated by acclamation the defendant Whitcomb.   It is impossible to conceive of a more uncalled-for or arbitrary proceeding.   The fact, then, being proven, and the law conceded, is it not illogical for the majority of this court to hold as it does in that part of the opinion which I have quoted, and say that the matter is essentially a political one, with which the courts should not interfere, but follow? the effect of which is to deprive Phillips of the right to the certificate of nomination, notwithstanding the mode of proceeding by ballot was deliberately adopted by all parties, and thus fairly implying that this method should be a finality, and which stood as the rule of the convention, never reconsidered or reversed.   It seems to me a novel proposition for a convention, under the present law, to declare viva voce that a ballot was informal, when by every parliamentary rule and practice it was formal, and that a proceeding was irregular, when by the universal practice it was regular.   Conventions are not and ought not to be, omnipotent, or to exercise imperial power, especially when individual rights of candidates will thereby be destroyed and the will of the people thwarted.

Can anything be suggested more arbitrary than depriving Phillips of his right to the certificate of his nomination, without any legal ground or excuse therefor? What had he done to forfeit this right? His Democracy does not appear to have been questioned. His character stood unimpeached. His ability was not challenged, and his availability not attacked. Was party harmony the end in view? How could that reasonably be expected or secured when, as a majority candidate, he and his friends had already been compelled to retire from the convention by these irregular proceedings, and this attempt to beat him out of a fair nomination?

The majority opinion holds that the convention had a right to reverse or correct its proceedings. What had it to correct by any subsequent proceedings? The ballot was a fair one, and Phillips had a fair majority, honestly given. Why apply this corrective doctrine, when there is no ground or necessity for it? Was making a third nomination correcting the first one legally made, if there was no reconsideration of the first vote taken and nothing to correct? And, if there was nothing to correct, it does not add any force to the opinion, or to the rights of the defendants, by saying that the power exists.

It is also said that a political convention has control over its own proceedings and officers, in the absence of any statutory regulations, and may proceed according to party usages and customs. In what conventions, and in what party, and at what time or times, was it ever heard of before that it was "party usage and custom" to defeat a nomination of a candidate made by a majority vote fairly and honestly given? There never was and never ought to be any such custom or usage, and the menace to the rights of the members of a political party will come by upholding the doctrine that the members of such a convention may, in the exercise of their judgment and discretion, utterly disregard the individual rights of the nominee, once fully and completely ascertained and determined, and arbitrarily keep his name off from the final ballot at the polls. The intolerable rule rests in the imperialism which overrides private and public rights, defies majority rule, and produces a fertile field for lobbying, bartering, buying and selling votes and places, and to this end induces and encourages the

ebb and flow of confusion and disorder in the convention. If this unsound and unpolitic rule can prevail as to one nominee, it can as to all. If at one hour, it can as to the next. If one or more delegates temporarily leave the assembly hall, and a majority for the defeated candidates remain, another ballot may be taken, and the first regularly and fairly nominated candidates ousted, and the farce and shuttlecock proceeding continue even day after day, until the convention finally adjourns, or naturally breaks up in a row. The evil consequences which will naturally flow from such a doctrine can easily be foreseen.

While this convention appears to have been free from fraud, lobbying or buying and selling votes, it seems to me that it is self-evident that it did act arbitrarily, and seek to deprive Phillips of his fair majority nomination for the office of sheriff, in a manner which I deem unsound law and poor politics. When the nomination of Phillips was fairly and legally made, as it must be conceded to have been, the power of the convention upon this particular matter was exhausted, unless for fraud or mistake, or some other just cause, which does not appear in this case; hence the convention could not lawfully declare that illegal which was legal, and deprive Phillips of his right to the certificate of nomination. State v. Wadhams, 64 Minn. 318, 67 N. W. 64.

The majority of the court, in support of their views, cite Manston v. McIntosh, 58 Minn. 525, 60 N. W. 672. That decision was made by a divided court, and it has been severely and justly criticised by a large number of the ablest members of the legal profession in this state. And until this court retraces its steps, and reverses the doctrine there laid down, just such confusion, disorder, irregularities and arbitrary powers as were there exercised, and are now upheld in this case, will continue to be the rule.

Under Laws 1895, c. 276, a convention is a legal body, whose acts are binding, not merely on itself, but upon the party it represents through its legally elected delegates. Such nominating assembly is no longer a voluntary one, but one where the law of regularity and stability should be observed; and the people have a right to suppose that legal rules will apply for their protection, as well as to the election itself. The wish of the people to have a candidate

of their own choice fairly nominated is just as important as to have one of their choice fairly elected. The candidate legally nominated is thereby given a legal status, to the exclusion of any other of the same party, unless by petition. The law authorizes the nomination, and recognizes it as fully as though he was an officer elect. A person must be a candidate before he can be an officer. The election is the consummation of the act of the people in making legal nominations through their delegates. The nominations and elections constitute, under the protection of the law, a status through which our government exists. Though each proceeding is separate, yet when combined they constitute the ingredients which the law recognizes as essentials in establishing its governmental functions.

Hence, if legal elections are dependent upon legal nominations, the candidates should be permitted to invoke the aid of the law, not only upon general principles, but in pursuance of G. S. 1894, § 48, which authorizes the court to direct the president or secretary of any convention to show cause why he has neglected to perform his duty, in not making and filing the certificate of nomination. This was intended to give the parties a hearing in a summary proceeding. For what purpose? To hear the facts and determine the law thereon, and not to dismiss the matter because it is political or governmental, or has once been decided by one faction of a convention, where the facts and law were both ignored, and to such an extent that even Conroy declined a second nomination so made by acclamation.

In the case of State v. Smith, 15 Ore. 98, 14 Pac. 814, and 15 Pac. 137, 386, upon an election of directors of a private corporation, the president, who by the by-laws was inspector of elections, declared the votes illegal; but the court disregarded the announcement, and held the majority candidate duly elected. In Parish v. Stearns, 21 Pick. 154,—an election by a church body,—it was held that the rule, founded in common sense, as well as supported by authority, is that a majority of the legal voters who choose to vote always constitutes an election. In State v. Fagan, 42 Conn. 32, it was held that the declaration of the chairman of the meeting was of no avail, in face of figures which showed to the contrary. In re Strong, 20 Pick. 484, the petitioner was a candidate for election as one of three

county commissioners. 1,956 votes were cast, making 979 necessary to a choice. 929 read for Elisha Strong of Northampton; 157 for Elisha Strong; 1,476 for Joseph Cummings of Ware; 671 for Chauncey R. Rising of Worthington. The board of examiners declared Cummings duly elected, but ordered a new election as to the other two on the ground that neither had a majority of the votes cast; and on the new election two other persons were given certificates of election, and duly inducted and sworn into office. Strong claimed the election, notwithstanding this action of the examiners; and the court held that he was duly elected, and entitled to the office. The court said, at page 497:

"It cannot be maintained that the decision of the examiners was an act within their legal discretion. * * * Nothing can be clearer than that the counting the votes, and ascertaining the majorities, and giving certificates of the result, are mere ministerial acts. They have no *discretion* in determining which of the candidates shall be elected. It must be the result of pure, inflexible, mathematical calculation."

In State v. Circuit Judge, 9 Ala. 338, it was held that the party who actually received the majority of the votes cast was elected, and entitled to the office, notwithstanding that the election "managers" declared another person elected, and notwithstanding that the circuit judge, who by statute was made supervisor of elections, declared the vote void, and ordered another election.

At page 344 the court said:

"We apprehend this [the right to a certificate] is the right of any one who can make it appear that he has the greatest number of votes cast by legal voters at an election in which the will of the people is legally pronounced;" citing Rex v. Mayor, 4 Term R. 699, 5 Term R. 66.

"It is well settled that the duties of canvassing officers and boards are ministerial merely, and not judicial. Their duty is to count the votes as cast, and they have no authority, unless expressly granted, to hear evidence or to pass upon or correct alleged errors, irregularities or frauds." Mechem, Pub. Off. §§ 208, 209.

"The finding of the canvassers, and the certificate of election issued by them, if any, are prima facie evidence of the result, and of the title to the office. * * * But such finding or certificate is not conclusive, unless expressly made so by law, in a direct proceeding to try the title to the office. The fact of having a plurality

of the votes lawfully cast is what confers the title to the office, and it is always open for the party receiving such plurality, unless otherwise expressly provided by law, to go behind the certificate or the returns, and to establish this fact before the appropriate tribunal, although the canvassers may have decided otherwise." Id. § 212, citing many cases.

"The legality of the election, and the rights, powers and duties of the office, do not depend upon the fact of the declaration of the board of election. That declaration is proper, and is the usual practice; but withholding it, or neglecting causelessly or illegally to make it, will not prevent the installation in, and investment with, the office. The authority, rights and powers of such offices are derived from the election, and not from the returns, which are merely the usual prescribed evidences of it." People v. Kilduff, 15 Ill. 492.

Of course, the last authorities are cited upon the proposition that the law as it now stands gives to the candidate once fairly nominated a legal status analogous in principle, though perhaps somewhat different in degree, to the status of a person already elected to an office, who has not yet qualified, and that there is no distinction in principle between the right of a regularly nominated candidate and the right of a regularly elected officer to hold the office itself.

In conclusion, I am of the opinion that the result reached in the majority opinion is one founded in error, not conducive to regularity, stability or good order in political conventions, but one that will result in encouraging disorder and confusion, lobbying, buying and selling votes, and intrigues and combinations detrimental to good government and the welfare of the people. I am of the opinion that Phillips is entitled to the relief prayed for.