William J. IRISH, Alvin C. Currier, Robert D. Lippert, Michael C. Fleming, Harry Miller, Alex Patrick, Virginia Patrick, David Steen, Glenn Church, Rachael Church, on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

DEMOCRATIC–FARMER–LABOR PARTY OF MINNESOTA et al., Defendants.

No. 3–68 Civ. 178.

United States District Court
D. Minnesota,
Third Division.

Aug. 7, 1968.

Page 795 is redacted.

Hyman H. Cohen, Gordon C. Moosbrugger, Kenneth E. Tilsen, and Michael J. Healey, St. Paul, Minn., for plaintiffs.

Robert S. Nickoloff, Hibbing, Minn., and Leonid Hurwicz, Minneapolis, Minn., pro se.

William F. Brooks, Jr., Minneapolis, Minn., for defendant Kubicek.

Thomas L. Ulmen, Minneapolis, Minn., for defendants Harris, Vail, Wright, Amram, Dodge, Knight, Lowery, Gruhn, Tomlinson, Snyder, Shear, Dworkin, Heffernan, Smith, Kaibel, Warder, Holmberg, Luther, Berry, Hale, Street, Oatman and Steen.

John D. French, Minneapolis, Minn., with Lawrence D. Cohen, St. Paul, Minn., John P. Karalis and Jonathan Lebedoff, Minneapolis, Minn., of counsel, for remaining defendants with the exception of certain defendants who made no appearance, namely defendants Hart, Powers, Breeze, Warnke, Glenn Peterson, Farr, Jackson, Carl Anderson, Beck, Stimpert, George, Schwartzbauer, Potter, McCarthy, Connolly, Murphy, Reginald Harris, Smaby, Youngdale, Tice, Spellacy, Hebert and Shapiro.

NEVILLE, District Judge.

By this proceeding this court is asked to hold that the "one man-one vote" principle fathered by Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), decided on the basis of the equal protection clause of the Fourteenth Amendment of the United States Constitution is applicable to a Minnesota state political party convention, so as legally to enable a challenge successfully to be made to the composition of the convention membership and thus void, in part at least, the convention proceedings. No authority has been found for so doing and all of the parties before the court consider this to be a case of first impression. Specifically the complaint asks the court, *inter alia*, to declare void the election by the Minnesota Democratic-Farmer-Labor party (DFL) of 60 delegates to the Democratic National

Convention[1], and prays for an order requiring the DFL to call new conventions to elect new delegates. The complaint further seeks to enjoin the present delegates, elected at the DFL State Convention on June 21–23, 1968, from participating in the Democratic National Convention "in choosing and electing nominees * * * for the offices of President and Vice President * * *." Plaintiffs filed with their complaint a motion for a preliminary injunction. A substantial number of defendants answered but joined with plaintiffs in their prayer for relief. A majority of defendants, however, answered resisting plaintiffs' prayer for relief and presented a joint motion for a judgment of dismissal on the pleadings, now a summary judgment motion pursuant to Rules 12(c) and 56 of the Federal Rules of Civil Procedure. Before termination of the oral arguments, all parties agreed and the court consented, that the case should be deemed tried and submitted on the merits and the motions submitted merged therewith.

Nearly the precise question here presented was expressly left undecided and open in Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). The court there held invalid the "unit rule" method of counting votes in a Democratic Primary election, and stated at p. 378, fn. 10, 83 S.Ct. at p. 807:

"We do not reach here the questions that would be presented were the convention system used for nominating candidates in lieu of the primary system."

The instant case presents, in reality, even a more difficult question than the Supreme Court left open in *Gray* because in Minnesota all state "elective offices," except presidential electors, are subject to the Minnesota primary law. Minn. Stat. § 202.02. Hence, plaintiffs ask us to decide in effect not only that the "one man-one vote" principle is applicable to conventions which actually nominate candidates for state elective offices (which they do not in Minnesota), but to carry the matter one further step to the nomination of delegates, whom it is conceded, are neither state officials nor elective candidates.

■ The case at bar is not claimed to be one of racial discrimination but rather one involving area misapportionment. The Fifteenth Amendment to the Constitution provides that "The right of citizens of the United States to vote shall not be denied or abridged * * * by any state on account of race, color, or previous condition of servitude." It is not here contended that the alleged discrimination is of this kind. Further, at the oral argument, plaintiffs withdrew the contention set forth in the complaint to the effect the DFL party officers were illegally elected. Defendants, after production of an affidavit by plaintiffs, abandoned their challenge as to plaintiffs' standing to sue as taxpayers, registered voters and (in varying degrees) participants in precinct, county and district conventions of the DFL party. The court concurs that plaintiffs have standing under Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); see Flast v. Cohen, 392 U.S. 83, 88 S. Ct. 1942, 20 L.Ed.2d 947, 6/10/68.

A brief summation of the facts is in order.

The Democratic-Farmer-Labor party (DFL) is affiliated with the National Democratic Party and is its counterpart in the State of Minnesota.[2]

In question here and requested to be declared void is the 1968 election of delegates to the Democratic National Convention. The claim by plaintiffs is that in electing such delegates—60 persons though casting but 50 votes at the na-

---

1. The Democratic National Convention is scheduled to meet in Chicago, Illinois, August 26, 1968, 25 days from the date plaintiffs put this case on for argument and trial and 20 days from the date of this decision.

2. For historical and perhaps other reasons the name "Farmer-Labor" is attached to and follows and is used with the Democratic party name in Minnesota.

tional convention [3]—practices leading to gross, invidious and systematic malapportionment and discrimination were pursued.

The Minnesota Statutes governing elections are confined largely to a regulation of precinct caucuses, Minn.Stat. §§ 202.-22 thru 202.27. There are no statutes regulating county, district or state conventions, though Minnesota Statutes do recognize the existence of political parties and provide that final authority "over affairs of each political party" is vested in the state convention; that the general management of party affairs is vested in "the party's state central committee;" that the state executive committee "shall have charge of the administration of the party's affairs" subject to the convention and the central committee. The statutes require that a copy of the party's constitution shall be filed with the Secretary of State. Minn.Stat. § 202.20. Such action of the DFL party as is here challenged cannot be deemed to be pursuant to nor prohibited by any express Minnesota Constitutional or statutory provisions. Such action as was taken was motivated by the DFL party itself and not pursuant to any express State directive. This leaves open the question whether such comprises "state action" within the meaning of the decided cases. Both the Fifteenth Amendment and particularly the equal protection clause of the Fourteenth Amendment limit action that can be taken by the several states.[4] This question will be discussed hereinafter.

The State DFL Constitution as amended July 1966 provides in pertinent part as follows:

"Article II—Precinct Caucuses

Section 1. The basis for the party organization structure shall be the precinct caucuses held in the spring of every even-numbered year upon the Call issued by the state chairman subject to the determinations of the State Central Committee and the Minnesota Election Laws. * * * Any person who attends his precinct caucus of this party shall be entitled to vote at that caucus if he qualifies under the membership articles of this Constitution.

Section 2. The duties of the precinct caucuses shall be to elect * * * delegates and alternates to the county and legislative district conventions.

\* \* \* \* \* \*

Article III—County Conventions and Organizations

Section 1. County conventions, composed of the aforementioned precinct delegates shall be held in each county in even-numbered years. It shall be the duty of the county conventions to elect one delegate to the state convention *with one vote for each 1,000 votes cast in that county for the leading statewide Democratic-Farmer-Labor candidate* or national Democratic candidate at the last general election or last presidential election, whichever is greater, *provided, however, that each county shall be allocated at least six votes.* * * * They shall also serve as delegates to their respective congressional district conventions. * * * (Emphasis added)

\* \* \* \* \* \*

Article IV—Congressional District Conventions and Organizations

Section 1. Congressional district conventions shall be held in each even-numbered year at a convenient time and place, under the provisions of the Call issued by the state chairman. Such conventions shall be composed of all delegates elected to the state convention within that district and any at-large state convention delegates resident in the district. * * *

---

3. Twenty of the delegates will cast but one-half vote. This practice is in accordance with procedures of the National Democratic Convention.

4. The Fourteenth Amendment reads in part: " * * * nor shall any State deprive * * * any person within its jurisdiction the equal protection of the laws".

\* \* \* \* \* \*

Section 3. In presidential election years it shall also be the function of the [congressional] district convention *to nominate* the delegates and alternates to the national convention allocated to them in accordance with the rules, regulations and directives of the State Executive Committee and the Democratic National Committee, *subject to the ratification of the state convention.* (Emphasis added)

\* \* \* \* \* \*

### Article VI—State Conventions and Organizations

Section 1. The state convention is the supreme governing body of this party. Subject to the action of the State Central Committee or the State Executive Committee, the state chairman shall call a regular state delegate convention each even-numbered year and may call such other delegate conventions as may be desirable.

\* \* \* \* \* \*

In presidential election years the state convention shall elect delegates to the national convention and elect the national committeeman and committeewoman.

Section 3. Prior to each convention, the state chairman, under the direction of the State Executive Committee, shall issue a Call to the convention *setting forth the number of votes to which each county is entitled in that convention* \* \* \*. (Emphasis added)

### Article VII—State Party Administration

Section 1. The general management of the affairs of the state party shall, in accord with the provisions of this Constitution, be vested in the state convention and subject thereto in the State Central Committee, and, subject to the determinations and directions of the said two bodies, in the State Executive Committee."

Pursuant to the Minnesota DFL Constitution the chairman and secretary of the party duly issued a convention Call fixing the date of the State Convention for June 22 and 23, 1968 at Saint Paul, Minnesota, and establishing progressively earlier dates for Congressional district conventions, County conventions and Precinct caucuses. The Call established a total of 1,106 delegates to be elected by the 87 different county conventions plus 13 at-large delegates, a total state delegation of 1,119. In issuing the Call the chairman and secretary followed the above-quoted provision of Article III of the Constitution and allocated a minimum of six delegates to each and every county in Minnesota. Some 55 of the 87 counties thus elected six state convention delegates though on the basis of one delegate for each 1,000 voters and without the minimum allocation of six delegates to each, these 55 counties (or nearly all of them) would have elected fewer than six delegates. Plaintiffs' principal claim in this law suit is that this constitutes a gross and invidious malapportionment. Plaintiffs have made a computation showing that 172 more delegates from the rural or less populated counties or counties with a small previous Democratic vote were elected than would have been the case if a full apportionment had been made on the basis of one delegate for each 1,000 Democratic voters. This is alleged to operate to the detriment of the metropolitan and more heavily populated counties where the minimum of six delegates was exceeded. It is alleged in plaintiffs' complaint:

"By means of said apportionment system there was allotted 172 delegates to said State Convention of the defendant Democratic-Farmer-Labor Party in excess of those elected on the basis of one delegate per 1,000 Democratic-Farmer-Labor votes. Thus, each delegate allocated to the smallest county (Cook County) represented 162 Democratic-Farmer-Labor voters, while each delegate allocated to the great urban centers such as St. Paul, Minneapolis, and Duluth represented 1,000 Democratic-Farmer-Labor voters, or a ratio greater than 6 to 1.

Said 172 excess delegates were greater in number than the total delegate strength allotted to Ramsey County, more than double that of St. Louis County, over 42% of the total of Ramsey, Hennepin and St. Louis Counties combined, and constituted almost one-sixth of the total delegates to said convention.

The smallest 55 out of the 87 counties of the State, being over 63% of the counties, represented 214,203 Democratic-Farmer-Labor votes out of a total of 991,117 votes, or less than 22% of the total State Democratic-Farmer-Labor vote, were favored by the allocation of such excess delegates." [5]

It may be noted in passing that despite the above, the three big urban counties encompassing St. Paul, Minneapolis and Duluth had a total of 455 delegates and that the total delegates from the above 55 counties comprised under 30% of the total convention delegates.

■ The claim is not made that the "one man-one vote" principle did not apply to the precinct caucuses. It is admitted and agreed that under the system employed, anyone who wished could appear at a precinct caucus and if he certified (Minn.Stat. § 202.24) that he was or would be a qualified voter and is in agreement with the principles of the party he might vote for the election of delegates to the county convention. Every such person who cared to participate had his vote at this level on a "one man-one vote" basis. The delegates to the county convention are thus not claimed to be malapportioned. The claimed evil in the process is that at the next level, there came a directive in the form of the convention Call to the county delegates in county convention assembled

that in accord with the DFL Constitution that they should elect a predetermined and specified number of delegates to the State convention. The same delegates when elected served also as delegates to the particular congressional district convention in which the county was situate. The claim is that by such arbitrary allocation the Democrats, in the more populous counties where the allocation of delegates exceeded the minimum, who had attended the precinct caucuses had their votes debased and diluted because the number of delegates to be in turn elected by the delegates they were then electing and who thus would go to the State and Congressional district conventions were malapportioned by virtue of using the minimum of six to each county.

Plaintiffs in their second contention assert a different type of malapportionment in that the nomination of five delegates in 1968 was allocated by the State Central Committee, or the Executive Committee to each of Minnesota's eight congressional districts. So finally a total of 40 of the 50 National Convention delegates allocated to Minnesota are spread among the eight congressional districts even though the proportion of Democratic voters varies substantially between the eight congressional districts. If the number of Democratic voters in congressional districts is used as a basis, one congressional district should be entitled to only 3.8 delegates and another to 6.1 delegates.

■ Actually the DFL Constitution states that in presidential years the congressional district conventions shall "nominate the delegates * * * allocated to them in accordance with the rules, regulations and directive of the State Executive Committee * * * subject to the ratification of the state

---

5. It was noted that whereas the DFL Constitution provides one state convention delegate for each 1,000 votes, the chairman and secretary on the convention Call added that there should be a delegate for "any major fraction thereof." Plaintiffs have calculated their degree of malapportionment on the theory that to any

number of Democratic voters less than 1,000 there is allocated no delegate. Even were a delegate to be allocated to a major fraction of 1,000 votes, however, there would still remain approximately 122 delegates in excess of one per 1,000 voters attributed to the lesser populated counties.

convention." It would thus seem that the state convention is the final determinator as to whether or not to elect those merely nominated by the congressional district conventions. This facet of the problem seems therefore not to be a malapportionment. The court does not discern in this a constitutional defect running afoul of the "one man-one vote" principle. See Dusch v. Davis, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967).

■■ Plaintiffs apparently claim a third constitutional deficiency. It appears that the State convention in June 1968 ratified and thus elected the 40 delegates nominated by the eight various congressional district conventions. The State convention then elected an additional 20 delegates at-large. The total number of delegates allocated to the State of Minnesota by the Democratic National Party for the 1968 convention is 50, plus two who are automatic, i. e., the national committeeman and national committeewoman. Since 60 were elected by the DFL State Convention, it became necessary to allocate to some delegates a one-half vote (lesser fractions are not permitted). On July 27, 1968 the delegates to the National Convention themselves met and, so the court is informed, by their own action reduced the total voting strength of the five National Convention delegates nominated from each congressional district to 4½ votes and reduced 12 of the 20 delegates at large to a one-half vote status. Complaint is made that this constitutes arbitrary action and resulted in further debasing and diluting the effect of "one man-one vote." The court does not see that this relates to the "one man-one vote" principle. If every man has his equal right to vote for his Congressman, legislator, county commissioner, etc., such action as they take thereafter when elected such as appointing some to more important committees than others, or electing some to other positions or as officers, or as in this case reducing the voting strength of some cannot in the court's opinion be related to the equal protection clause nor amount to a Constitutional violation. See Sailors v. Bd. of Education, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967).

⌐ The issue before the court is in reality whether a court should interfere with the internal workings and management of a political party, particularly in a case such as this where it is not denied that at the "grass roots" level, i. e., the precinct caucuses, the "one man-one vote" principle was and has been complied with. The malapportionment, if such it be, is a result of the execution of the constitution of the DFL as a political party, not the by-product or result of any state statutes or state constitutional provision.

A preliminary question is said to be that of "state action." Argument has been devoted to the hypothesis that what the DFL party did constitutes "state action" within the meaning of the Fourteenth Amendment and the Civil Rights Act. These prohibit action by the State; thus generally actions by private parties do not violate such. The court does not deem it necessary to decide this question at this time, though it does not wish this opinion interpreted to bar the possibility of subsequent court interference and direction if discrimination in voting by a political convention or party should become based, for instance, on color, race or creed or becomes otherwise an invidious discrimination. In the view this court takes of this case, however, and the result reached, the question of "state action" need not be faced directly for even if what was done constitutes "state action" the court still is of the opinion that plaintiffs' complaint should be dismissed.

■ The civil rights sections of the United States Code, 28 U.S.C. § 1343 and 42 U.S.C. §§ 1983 and 1988, confer original jurisdiction on federal district courts of actions to redress the deprivation, under color of any state law or action, or rights secured by the Fourteenth Amendment of the Constitution of the United States. Davis v. Foreman, 251 F.2d 421 (7th Cir.), cert. denied, 356 U.S. 974, 78 S.Ct. 1137, 2 L.

Ed.2d 1148 (1958); Hackin v. Lockwood, 361 F.2d 499 (9th Cir.), cert. denied, 385 U.S. 960, 87 S.Ct. 396, 17 L. Ed.2d 305 (1966). More specifically, the federal district courts have original and subject matter jurisdiction under these sections to correct the malapportionment of voters in state elective offices where such a state has denied its citizens equal protection of the laws. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Honsey v. Donovan, 236 F.Supp. 8 (D.Minn.1964); Honsey v. Donovan, 249 F.Supp. 987 (D.Minn.1966).

 Often the threshold question to be met before a district court will assume jurisdiction is whether there has been sufficient "state action." See, e. g., Jones v. Alfred H. Mayer Co., 255 F. Supp. 115 (E.D.Mo.1966), aff'd, 379 F. 2d 33, 38–39 (8th Cir. 1967). This is because the Fourteenth Amendment applies only to state action or action taken under color of state authority. See, e. g., Shelley v. Kraemer, 334 U.S. 1, 68 S. Ct. 836, 92 L.Ed. 1161 (1948). However, through the years this requirement has been regarded as only a minimum jurisdictional requirement. Thus, as expressed by the Eighth Circuit in Jones v. Alfred H. Mayer Co., supra, 379 F.2d at 41:

> "Over and beyond this generally broad and seemingly expanding approach to the concept of state action are certain indications in recent Supreme Court opinions that state action is shrinking as a factor of deterrent influence in the area of discrimination."

This "state action" concept has been applied to political parties when they have become involved in the state election process. In Smith v. Allwright, 321 U. S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) the Supreme Court invalidated a Democratic State Party convention resolution which limited participation to only white voters in primary elections conducted by the party under statutory authority. The Court denied the fact that a political party had the inherent power "with-

out restraint by any law to determine its own membership." 321 U.S. at 659, 64 S.Ct. at 762. The party, insofar as it was involved in the selection of party nominees for inclusion on the general election ballot, was deemed an agent of the state. 321 U.S. at 663, 64 S.Ct. 757. The "state action" concept has also been applied to political parties operating without any statutory authorization. Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) invalidated the all white membership requirement of the Jaybird Association which held a pre-primary. It has held immaterial that the state did not control or regulate this part of the elective process inasmuch as the Jaybird Association was "an integral part, indeed the only effective part, of the elective process that determine[d] who [should] rule and govern in the county." 345 U.S. at 469, 73 S.Ct. at 813.

 On the other hand, the court is mindful of the fact that courts are reluctant to become involved in the internal affairs of a political party. The Minnesota Supreme Court has followed this position. In Democratic-Farmer-Labor State Central Comm. v. Holm, 227 Minn. 52, 33 N.W.2d 831 at 833 (1948) the court commented:

> "The rule with regard to judicial review of the actions of political conventions is that in factional controversies within a political party, where there is involved no controlling statute or clear right based on statute law, the courts will not assume jurisdiction, but will leave the matter for determination within the party organization."

Lynch v. Torquato, 343 F.2d 370 (3rd Cir. 1965) noted that "the normal role of party leaders in conducting internal affairs of their party, other than primary or general elections, does not make their party offices governmental offices or the filling of these offices state action * * *." 343 F.2d at 372. The court distinguished the doctrines of "state action" vis-a-vis "internal af-

fairs" according to the type of function performed.

In any event, under the facts of this case, the court denies relief for other reasons than the question of "state action".

### FIRST

Presidential elections differ from state elections and in a sense are *sui generis*. No other election has quite the characteristics of a presidential election whether by custom or by law.

At the very top is the Electoral College, for whose members voters in the general election ultimately will cast their votes. The use of the College is a variation from the "one man-one vote" criterion. Obviously, it cannot be questioned constitutionally since the Electoral College is established in the Constitution; see Article II, § 1 and Amendment XII. The Electoral College in practice results in the "unit rule" on a statewide basis. Electors who are elected by 51% of the votes cast the entire state's vote in the Electoral College "meeting". Those comprising the 49% have votes worth nothing, except to be counted for the purpose of being discarded. It is historically true that on one or more occasions a presidential candidate has been elected President by the College who received less than a majority of the popular vote. The Electoral College further is comprised of one elector for each Representative and Senator to which the State may be entitled in Congress. Since each state has two senators irrespective of population, to that extent again the "one man-one vote" principle is not applied by the constitution itself in presidential elections.

It is further noted that the Democratic National party allocated its delegates to its Convention on anything but "one man-one vote" principle and ignored population. For instance, the Democratic National Convention allocated 50 votes to Minnesota (plus the national committeeman and national committeewoman) on the basis of three for each of the electors in the Electoral College (30),

one for each 100,000 popular votes or major fraction thereof cast in 1964 for electors who voted for the Democratic nominee (10), plus a bonus of 10 delegates because the state "went Democratic" and its electors cast their votes for the Democratic nominee. No one could contend that this is a "one man-one vote" allocation.

Coming to the Minnesota state convention, it is malapportioned to the extent that 172—or 122—extra votes inhere to the smaller counties (or counties casting less Democratic votes) by virtue of the awarding to each county a minimum of six state convention delegates. There is no evidence that there is anything inherently evil or that there is "invidious discrimination" such as race, creed, sex or color merely because rural delegates are somewhat in overstrength as distinguished from urban delegates. Of course under the teachings of Reynolds v. Simms, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L. Ed.2d 663 (1962) and other cases, however, it would seem that if one's vote is debased or diluted he is an interested party and actual harm or damage need not be shown.

In this case in any event the court believes that the requirement has been satisfied by according every Democratic voter his "one man-one vote" at the precinct caucus level and that the malapportionment is not a matter of constitutional violation nor is it a matter with which the court should interfere.

The court is hesitant to step into the situation at this level. What is before the court here is a challenge to the middle echelon of an entire elective process and what the court is asked to do is to consider the matter in a sense in a vacuum. Whatever might be done by this court could have little effect on the entire process. The court has no control over the National Democratic party or its practices and there is no challenge in this suit to the lower echelon, i. e., the

precinct caucus level. See standards set forth in Baker v. Carr, supra, at 217, 82 S.Ct. 691.

The court has noted that to date substantially all of the cases where the "one man-one vote" principle has been applied have involved the election of legislators, or those exercising a legislative function, i. e., those who are going to make laws that will govern the people who are voting. In fact, the principle was held not applicable in Fortson v. Morris, 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966) rehearing denied, 385 U.S. 1021, 87 S.Ct. 719, 17 L.Ed.2d 560 (1967) (election of governor by a malapportioned legislature); Sailors v. Board of Education, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967) (county school board members); New York State Ass'n of Trial Lawyers v. Rockefeller, 267 F. Supp. 148 (S.D.N.Y.1967) (Judges); Stokes v. Fortson, 234 F.Supp. 575 (N. D.Ga.1964) (Judges).

Defense counsel has contended that the court cannot or at least should not decide this case because indispensable parties (now "Persons Needed for Just Adjudication" under amended Rule 19(a) of the Federal Rules of Civil Procedure) are not joined. i. e., the National Democratic Party for one. The argument is that whatever action this court might take, the national party would not be bound and could seat the delegates according to its own rules. This in reality says that the malapportionment problem is much broader and much more involved than the question presented in this case at a level far down from the electoral college. This court of course is not unaware of the rejection in Gray v. Sanders, supra, 372 U.S. at 378–380, 83 S.Ct. 801, 9 L.Ed.2d 821 of the analogy to the Electoral College as being abortive when applied to a state election where the "unit rule" was applied by counties. That case, however, dealt with a state—not presidential—election and for this and other reasons this rejection does not seem apposite here.

Plaintiffs of course claim the election of delegates to the national party convention to be an integral part of the national election process and so intimately associated with it as to require action by the court in this case. In discussing this subject in Newberry v. United States, 256 U.S. 232, 41 S.Ct. 469, 65 L. Ed. 913 (1921) (though in a different setting) the judge in a concurring opinion said:

"It seems to me too clear for discussion that primary elections and nominating conventions are so closely related to the final election, and their proper regulation so essential to effective regulation of the latter, so vital to representative government, that power to regulate them is within the general authority of Congress. It is matter of common knowledge that the great mass of the American electorate is grouped into political parties, to one or the other of which voters adhere with tenacity, due to their divergent views on questions of public policy, their interests, their environment, and various other influences, sentimental and historical. So strong with the great majority of voters are party associations, so potent with party slogan, so effective the party organization, that the likelihood of a candidate succeeding in an election without a party nomination is practically negligible. As a result, every voter comes to the polls on the day of the general election confined in his choice to those few candidates who have received party nominations, and constrained to consider their eligibility, in point of personal fitness, as affected by their party associations and their obligation to pursue more or less definite lines of policy, with which the voter may or may not agree. As a practical matter, the ultimate choice of the mass of voters is predetermined when the nominations have been made. * * *"

While this argument has force and effect, and while at some time in the future the entire system may be changed by Constitutional Amendment or otherwise, this court does not believe it has the power nor can it exercise the juris-

diction to attempt such complete reformation of the present system.

## SECOND

The court believes that under the facts of this case, this is not a justiciable controversy because it is what has been characterized in the decisions as a political question.

 The general rule of the common law is that in the absence of a clear statutory grant of power, the courts generally will not decide political party intra-party disputes. State ex rel. McCurdy v. De Maioribus, 9 Ohio App.2d 280, 224 N.E.2d 353 (1965); Foster v. Ponder, 235 Ark. 660, 361 S.W.2d 538 (1962); State ex rel. Smith v. Bosworth, 145 W.Va. 753, 117 S.E.2d 610 (1960); Wallace v. Cash, 328 S.W.2d 516 (Ky.1959); State ex rel. Padgett v. Vanderburgh Circuit Court, 236 Ind. 43, 138 N.E.2d 143 (1956); Wagoner County Election Board v. Plunkett, 305 P.2d 525 (Okl.1956); Democratic-Farmer-Labor State Central Comm. v. Holm, 227 Minn. 52, 33 N.W.2d 831 (1948); Wall v. Currie, 147 Tex. 127, 213 S.W.2d 816 (1948); Morris v. Peters, 203 Ga. 350, 46 S.E.2d 729 (1948); Phillips v. Gallagher, 73 Minn. 528, 76 N.W. 285, 42 L.R.A. 222 (1898); 26 Am.Jur.2d, Elections § 126. But see Bentman v. Seventh Ward Democratic Executive Comm., 421 Pa. 188, 218 A.2d 261 (1966) where, acting under a rather specific election law, the court held it had mandamus jurisdiction over the question of election of two party committeemen.

 The State Legislature has the choice to decide whether or not the State should have a Presidential primary election.[6] If it does so, clearly it must protect the rights of individuals under the "one man-one vote" principle. If it chooses not to do so and leaves the matter to political party conventions, this is a political decision and one not to be interfered with by the courts; nor is the process in the convention to be interfered with unless there be an "invidious discrimination."

 In the case at bar, there was no maximum put on the number of state convention delegates from each county, but a minimum of six. The party may have good reasons for this to strengthen its own party, to get broad, statewide support, to retain interest in each of the 87 counties in the state, or for other reasons not known to the court, and yet which are not "invidious" as would be a discrimination on account of race, sex, color or creed. The party should be allowed to manage its own affairs so long as it complies with precinct caucus requirements. It appears to the court that a primary function of a political party in a democracy is the direction and control of the struggle for political power among men who may have contradictory interests and often mutually exclusive hopes of securing them. This the parties do by institutionalizing the struggle and emphasizing positive measures to create a strong and general agreement on policies. A judicial resolution of such conflicts cannot do this. Lack of "judicially discoverable and manageable standards" is stressed in Baker v. Carr, supra, 369 U.S. p. 217, 82 S.Ct. 691.

## THIRD

Finally, even were this court to attempt to grant some relief, the appropriateness of the relief sought here by plaintiffs is doubted. Since plaintiffs have bottomed their claim upon the so-called "one man-one vote" area reapportionment cases, the remedies thereunder should provide the guidance in the instant case. Plaintiffs have not cited nor

---

6. In the past, the State of Minnesota has regulated this process. Presidential primaries were first authorized by Minn. Laws 1913 ch. 449 amended Minn.Laws 1915, ch. 372, repealed by Minn.Laws 1917, ch. 133. The presidential primary was again enacted in Minn.Laws 1949, ch. 433, §§ 1–14, amended by Minn.Laws 1951, ch. 156, § 1, and amended by Minn. Laws 1957, ch. 404, §§ 1–8, repealed by Minn.Laws 1959, ch. 67, § 1. This presidential primary was not a popularity contest, but was an election of delegates bound to a particular candidate. Ryan v. Holm, 236 Minn. 189, 52 N.W.2d 406 (1952).

is the court able to find any area reapportionment case that has granted such extreme and urgent relief retrospectively.[7]

▊▊▊ Nearly all of the federal cases that have granted relief in the form of a mandatory injunction have not only done so prospectively, but in most of these, the court has stayed its hand in order to give the allegedly malapportioned body an opportunity to reapportion itself.[8] None have unseated existing Congressmen, legislators, county commissioners, etc.[9] Among the considerations dictating this result have been the court's confidence that the body would reapportion itself, the shortness of the time before an election[10] or legislative session and the undesirability of leaving the affected citizenry unrepresented. All of these factors appear to the court to be present in the instant case. As the Supreme Court in *Reynolds* said:

"* * * However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree." 377 U.S. at 585, 84 S.Ct. at 1394.

▊▊▊ While mere inconvenience to defendants will not be allowed to justify a denial of an appropriate remedy for violation of plaintiff's constitutional rights, there is no case compelling the particular relief sought here. Further, the court is not unmindful of the expense, inconvenience and physical difficulties of calling a new state convention.[11] Merely to declare the current delegates illegal might result in permitting the national committeeman and national committeewoman alone to cast all 52 votes of the Minnesota delegation.

▊▊▊ Plaintiffs suggest that, in the alternative, the court might by its order allocate the 50 delegates proportionately among the eight congressional districts based on the number of votes received in each district by President Johnson in

7. See Note, District Court Management of the Reapportionment Process, 114 U. Pa.L.Rev. 504, 506 (1966).

8. See Reynolds v. Sims, 377 U.S. 533, 587, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Honsey v. Donovan, 249 F.Supp. 987 (D. Minn.1966); Davis v. Cameron, 238 F. Supp. 462 (S.D.Iowa 1965); Preisler v. Secretary of State of Missouri, 238 F. Supp. 187 (W.D.Mo.1965); Stokes v. Fortson, 234 F.Supp. 575 (N.D.Ga.1964); Honsey v. Donovan, 236 F.Supp. 8 (D. Minn.1964); Baker v. Carr, 206 F. Supp. 341 (M.D.Tenn.1962) (on remand); League of Neb. Municipalities v. Marsh, 209 F.Supp. 189 (D.Neb.1962); Toombs v. Fortson, 205 F.Supp. 248 (N.D.Ga. 1962); Sims v. Frink, 205 F.Supp. 245 (M.D.Ala.1962); Lein v. Sathre, 205 F. Supp. 536 (D.N.D.1962); Magraw v. Donovan, 163 F.Supp. 184 (D.Minn.1958).

9. Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968) dealing with county commissioners is the latest U.S. Supreme Court case on this subject and did not unseat incumbents but ordered future redistricting.

10. See Colegrove v. Green, 328 U.S. 549, 565, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946) (Rutledge, concurring.)

11. Plaintiffs claim that the illegality began at the county level insofar as some counties elected more state convention delegates than they were entitled to, and continued up through the district and state conventions. Logic would thus dictate that new conventions would have to be held at all these levels, if at any.

1964. Defendant Hurwicz advanced this theory. It is difficult to see how the doing of this would overcome or is related to the alleged evil of the six vote minimum that each county is entitled to at the state convention. Further, there is no evidence that those elected as delegates to the national convention under the present system would be the same individuals as would have been elected by a convention apportioned as plaintiffs would want. Finally, no constitutional rule requires this result nor requires this court to substitute its view of delegation composition or voting strength for that of the convention even though the latter may be, *arguendo*, malapportioned.[12]

Indeed for this court to reapportion the DFL party by judicial fiat would be contrary to the policy this court already has expressed in the area of legislative reapportionment in Honsey v. Donovan, 249 F.Supp. 987, 988 (D.Minn.1966).

"The courts are not designed for the purpose of drafting legislative reapportionment plans. We are not equipped with the expert staff and manpower necessary for gathering, by public hearing or otherwise, the required basic data and diverse political, geographical and social viewpoints necessary to frame an equitable and practicable reapportionment plan. Judges are not ideally suited by training or experience artfully to perform the task. We are basically interpreters, not makers, of the law.

We are not unmindful that the courts do have authority to decree reapportionment, but this is a power to be exercised only in the extraordinary situation where the Legislature fails to do so in a timely fashion after having had an adequate opportunity to do so. Redistricting is basically and primarily a legislative responsibility."

In connection with the granting of relief, defendants argued that plaintiffs' own conduct should bar them.

Plaintiffs, though technically not guilty of laches, estoppel or waiver did not in fact contest the organization of the State Convention when it was seated, nor did they object at the County or Congressional District conventions. Though the court doubts that anyone under these circumstances can be said to have waived a right, if the convention be clearly unconstitutional, nor be guilty of laches or estopped thereby, still when such persons come to court to request injunctive relief which if granted would be expensive and highly disruptive and even chaotic, such is a consideration in connection with granting the requested relief.

A separate order has been entered and this memorandum opinion will serve as findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. For all of the reasons above, plaintiffs' complaint is dismissed on the merits.

---

12. See *Fortson v. Morris*, 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966), reh. den. 385 U.S. 1021, 87 S.Ct. 719, 17 L.Ed.2d 560 (1967).