**Kenneth A. BODE, Individually and as Director and on Behalf of the Center for Political Reform, et al., Appellees,**

**v.**

**NATIONAL DEMOCRATIC PARTY et al., Appellants.**

**No. 71–1536.**

United States Court of Appeals, District of Columbia Circuit.

Argued Aug. 25, 1971.

Decided Sept. 30, 1971.

---

Mr. Joseph A. Califano, Jr., Washington, D. C., for appellants.

Mr. William Josephson, Washington, D. C., with whom Messrs. Joseph L. Rauh, Jr., John Silard and Elliott C. Lichtman, Washington, D. C., were on the brief, for appellees.

Messrs. Arthur K. Bolton, Atty. Gen., State of Georgia, Harold N. Hill, Jr., Executive Asst. Atty. Gen., and Robert J. Castellani, Asst. Atty. Gen., filed a brief on behalf of the State of Georgia as amicus curiae.

Before FAHY, Senior Circuit Judge, and ROBB and WILKEY, Circuit Judges.

FAHY, Senior Circuit Judge:

The District Court has held in this case that the appropriate constitutional method of apportionment of delegates to the 1972 Democratic National Convention is by a formula, to quote the language of the order, "based on the number of Democratic voters voting in one or more immediately preceding Presidential elections." In so ruling, the court also held that the delegate allocation formula recently adopted by the Democratic National Committee—hereinafter the Committee—is discriminatory, without rational basis, and unconstitutional. Appropriate injunctive relief was entered to implement the decision. We are unable to agree with these rulings and accordingly we reverse.[1]

The formula adopted by the Committee provides for the allocation of a ceiling of 3,016 votes as follows: 1,386 (46% of 3,000) of the delegates are apportioned on the basis of each State's average Democratic voting strength in the last three Presidential elections, and 1,614 (54% of 3,000) of the delegates

---

1. The case originated as a complaint for declaratory and injunctive relief. It was decided on cross-motions for summary judgment and defendants' motion to dismiss, the court granting the plaintiffs' motion.

The plaintiffs-appellees, in addition to Kenneth A. Bode, who sues individually and as Director on behalf of the Center for Political Reform, include the Democratic National Committeemen and Committeewomen of the States of New York and California, the Chairman of the District of Columbia Democratic Central Committee, other Democratic Party officials, the National Chairman of the Americans for Democratic Action and the Chairman and representative members of the New York New Democratic Coalition. The defendants, now appellants, are the National Democratic Party, the Democratic National Committee, and the Chairman and Treasurer of the Democratic National Committee.

are apportioned to the States and the District of Columbia[2] on the basis of a multiple of three times their respective electoral college strength. The remaining 16 delegates are divided among the territories of Puerto Rico, the Canal Zone, the Virgin Islands and Guam.[3] Appellees do not question the upper limitation on the aggregate number of delegates, except they would eliminate the 16 as not representative of those entitled to vote and would apportion the remaining 3,000, as the District Court held to be the appropriate constitutional method, among the States according to demonstrated party strength. The theory upon which the court rested its decision is that the one man, one vote rule recognized in the reapportionment cases following Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), applies to the allocation of convention delegates among the States on the basis of "one Democrat, one vote." Presumably, the District Court thought that allocation of delegates on any other basis would result in disproportionate representation of Democrats from different States. The manner in which the delegates allotted to each State are selected within the State is not challenged, only the basis on which the allotment to the States has been made by the Committee.

I

■ Appellees, as did the court below, deem their position to be required by the provision of the Fourteenth Amendment that no State shall "deny to any person within its jurisdiction the equal protection of the laws," and by the decisions of the Supreme Court interpreting this provision in the reapportionment cases. A threshold condition to the application of the Equal Protection Clause is that the challenged action be that of a State. Plaintiffs in The State of Georgia et al. v. The National Democratic Party et al., 145 U.S. App.D.C. ——, 447 F.2d 1271 (1971), challenged the delegation allotment of the 1972 National Conventions of both the Democratic and Republican Parties as violative of the Equal Protection Clause because not based solely on population in conformity with the one man, one vote standard. Pointing to the Supreme Court decisions holding that state action was involved in the methods by which state political parties nominate candidates for local or national office,[4] the *Georgia* court reasoned that state action was no less present when a state political party selects delegates to the party's national convention. The court then said:

[I]f the action of the individual state parties in selecting delegates to participate in the presidential-nominating process constitutes state action, the collective activity of all the states' delegates at the national convention can be no less readily classified as state action.

We accordingly hold, following *Georgia*, that the decision made by the Democratic Party at the national level, here challenged, is tantamount to a decision of the States acting in concert and there-

2. As a matter of convenience in composition our use of the words "State" and "States" will include the District of Columbia.

3. This formula is the result of an overhaul of the structure of the National Democratic Party initiated at the 1968 National Convention. The Convention created the O'Hara Commission to examine, *inter alia*, the delegate allocation system as it had evolved up to 1968. In 1971 the Democratic National Committee met to determine the most effective method of· distributing convention delegates among the States. To this. end six formulae were considered. Ultimately, the formula developed by the O'Hara Commission, as modified by the Executive Committee of the Democratic National Committee, and as explained in the text, was unanimously adopted.

4. Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953).

fore subject to constitutional standards applicable to state action.[5]

■ Beyond the question of state action lies another preliminary condition to the application of the equal protection standard, that of justiciability. On that question, the issues in the present case cannot be distinguished from those in *Georgia* that were held to be justiciable. Although, as we shall see, policy considerations are here involved as they were in *Georgia*, nevertheless, "judicially manageable standards," Baker v. Carr, *supra*, at 226, 82 S.Ct. 691, are not lacking to guide judicial decision. The "courts are competent to scrutinize the allocation schemes promulgated by the national parties in order to determine whether, given the context of political partisanship out of which such formulas necessarily arise, substantial deviations from equality of voting power at the Conventions are supported by legitimate justifications." *Georgia, supra* at —, 447 F.2d at 1278.

■ Absent unconstitutional classifications based on race, religion, sex or economic status, deviations from mathematically precise equality of voting power may be allowed to further some reasonable countervailing policy, Swann v. Adams, 385 U.S. 440, 444, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967); Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971). Measuring against such standards set by the Supreme Court, the court in *Georgia* held that delegate allocation based solely on state population is not allowed by the Equal Protection Clause, as claimed by appellants in that case. In so holding, however, the court explicitly avoided passing on the validity of apportionment based solely on demonstrated party strength,[6]

a question before us to which we now turn.

## II

■ In order to avoid discrimination violative of the Equal Protection Clause we do not find it to be essential that the party allocate convention delegates to States in proportion to the number of Democratic voters voting in the respective States in one or more preceding Presidential elections.[7] The District Court, holding otherwise, thought that the reapportionment decisions of the Supreme Court, resting upon the one man, one vote formula, protecting from "debasement or dilution of the weight of a citizen's vote," Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964), require the convention delegates to be apportioned on a one Democrat, one vote basis.

In *Reynolds* the Court elaborately explains the reasons for the one man, one vote principle:

> [E]ach and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies.

The Court continued,

> Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his State legislature.

*Id.* at 565, 84 S.Ct. at 1383.

■ There is no doubt that the allocation among the States of delegates to a party national convention is subject to the equal protection requirements of the Fourteenth Amendment. We are not prepared to hold, however, that the only constitutionally acceptable formula

---

5. We need not enlarge upon the additional reasons assigned in *Georgia* for reaching the same conclusion.

6. The plaintiffs-appellees in the present case filed in *Georgia* a motion to intervene or, in the alternative, to participate as *amici curiae*. The latter motion was granted because of the considerable overlap of issues raised by both cases. Denial of the motion to intervene was based on the court's view that this case was dissimilar in important respects. *Georgia, supra* at —, 447 F.2d 1271.

7. Sometimes herein referred to as "party strength."

for such allocation is one based solely on prior party strength—one Democrat, one vote. The argument for applying such a criterion to delegate allocation begins by assuming, rightfully, that the nominating process at a national party convention is an "integral part" of the elective process. Appellees argue further that the convention must provide those who are there represented an equal voice as tantamount to the equal vote guaranteed by the reapportionment cases. In appellees' view this would insure that the ultimate vote would be more than a rubber stamp of a decision made by delegates without regard for the wishes of those who appellees say should be represented at the convention. To implement their theory, appellees would allow only "Democratic" representation at the national convention; and to determine the number of "Democrats" in each State entitled to representation appellees would look to an average of the number of votes cast for the Democratic Presidential nominee in the three immediately preceding Presidential elections. None of the Supreme Court decisions, however, has passed upon a contention comparable to the one thus advanced; and we think none requires such a rigid formula.

 The Equal Protection Clause, as we have indicated above, embraces within its protection proceedings intimately connected with the progression of the elective process. It prohibits, for example, racially-motivated exclusion of eligible voters from primaries, Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927), and Nixon v. Condon, *supra;* the weighting of primary votes

in favor of sparsely-populated counties, Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); and the requirement of geographical support in petitions by independent candidates for placement on the ballot, Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969).[8] Yet in all cases dealing with apportionment, or candidate-sorting through primary or petitioning procedures, it is the franchise that is protected from debasement or dilution. In such cases not only is there a clear correlation between the citizen's vote and the procedure being challenged, but those entitled to representation are, under any of several constitutional definitions of population,[9] readily ascertainable.

In the case before us, however, though the demands of the Equal Protection Clause must be met, an individual's voice at the convention is more removed from an individual's vote at a previous or subsequent election. Nor is the individual to be represented identifiable except in a loose, conceptual sense. Appellees would define such individual as one who cast an anonymous vote for the Democratic Presidential candidate in an earlier year. It seems to us that the constituency represented at a national convention does not comprise solely "Democrats," so defined. To the extent that a voter, whether he be a registered Democrat or Republican, third party adherent or independent, is given alternative slates by the two major parties, he has a stake in the outcome of the nominating process of both parties. Accordingly, the constituency for a national convention comprises to a certain degree the entire electorate.[10] By viewing the constitu-

---

8. *Cf.* Gomillion v. Lightfoot, 364 U.S. 339, 342, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). Likewise the Fifteenth Amendment, which applies with equal force against racial discrimination in the elective process, prohibits a racially-motivated bar to participation in primaries, Smith v. Allwright, *supra,* and from voter canvassing tantamount to a primary, Terry v. Adams, *supra.*

9. *See, e. g.,* Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966);

*cf.* Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964).

10. When this court stated in *Georgia, supra* at ——, 447 F.2d at 1279, that the "constituency of each party is significantly smaller than the whole of the eligible electorate, and varies dramatically from state to state and from election to election," the context shows that the court used the term "constituency" in the sense of adherents. This does not mean that the *Georgia* court viewed a national con-

ency of the Democratic National Convention in this way, the application of appellees' theory—that the allocation of delegates must be based on past performance—could theoretically result in a failure to represent, or at best, in an underrepresentation, of those who might wish to nominate and vote for a nominee different from the one ultimately selected at the convention. To identify and count potential Democrats is impossible, requiring desirable but unavailable clairvoyance. Elusive too is the utilization of past voting patterns—transitory political phenomena—to ascertain the current population to be represented at a national convention.[11] As we shall see from our discussion of the Committee plan in Part III, *infra,* none of the Supreme Court decisions involving the fundamental position that political power resides in the people, and is to be equally distributed among the qualified voters, requires a single convention formula as decreed by the District Court. True it is that the nominating power may not be removed so far from population control as seriously to impair the right of the qualified voters to influence the choice of candidates for whom they eventually will have an opportunity to vote. But the maintenance of this situation does not require the court to go so far as to bind a national political party in its nominating councils to listen solely to voices allotted on a mathematical calculation of previous party strength in the respective States, with only a slight tolerance of variation which might be overlooked, but which does not depart from the stated criterion. No invidious discrimination is necessarily incident to departing from so rigid and, indeed mathematically uncertain, a formula. That this is so we think becomes clear when we consider whether the Committee plan is itself valid under the Equal Protection Clause.[12]

### III

The Committee plan allocates 46% of the delegates to the States on the basis of past party strength in each State.[13] As we hold in Part II, the Fourteenth Amendment does not require this basis to the exclusion of all others. Nor is it contended that the Fourteenth Amendment prohibits its use in part. Aside from the 16 delegates allotted to the territories, the contest as framed by appellees revolves around that aspect of the Committee formula which provides for the allocation of 54% of the delegates on the basis of a multiple of three times the electoral college strength. The tripling of the number is not questioned, only the use of the collegiate principle.

Under Article II of the Constitution, the electoral college is composed of members from each State equal in number to the Senators and the Representatives in the House to which the State is entitled. The number of Representatives depends upon State census population. The electoral college composition stemmed from the Great Compromise of the 1787 Constitutional Convention, which afforded each State two Senators, regardless of population. The Compromise met the objections of the less populous

---

vention as representative only of avowed party members, or even of voters who in the past voted for one particular party nominee.

11. It is impossible to determine accurately who, among those who will vote in the 1972 election, voted Democratic in previous elections. This defect in the formula adopted by the District Court is enlarged by the unknown political adherence of millions of newly-enfranchised voters of 18 through 20 years of age.

12. Appellees refer also to the Due Process Clause but advance no contentions not encompassed by those based upon the Equal Protection Clause.

13. The language of the Committee plan is more precise than the order of the District Court in articulating the formula for calculating the Democratic population of the States. Party population is defined by the Committee as the average of the count of votes cast for the Democratic Presidential candidate at the last three Presidential elections. The District Court order states the population as the number of "Democratic voters voting" at one or more immediately preceding elections.

States to a distribution of national political power solely on a population basis notwithstanding the federated character of the new nation, formed of sovereign States.

In a variety of situations, but none of national scope like the present, which have come before the Supreme Court in the reapportionment cases, the Court has not approved the electoral college analogy as permitting a departure from a strict population basis for the distribution of voting power. The cases include the election of members of a state legislature [14] and members of the United States Senate.[15] In rejecting the use of the analogy to weight more heavily the rural vote in state legislature elections, the Court in *Reynolds, supra,* contrasted the federated character of the nation with a State's relation to its own political subdivisions. Because such subdivisions are non-autonomous creatures of the State, whereas the nation was formed by sovereign States voluntarily coming together as a nation, the electoral college analogy was deemed inappropriate to justify departing from the fundamental theory of our government as resting upon the right of the people to elect their governors by casting equal votes.[16] The Court has never held, however, that it is an impermissible departure from this fundamental theory to permit the electoral college analogy to have some part in the allocation of delegates to a national convention which is to nominate candidates, not for state or county offices, but for President and Vice-President, whose very elections are to be made by the electoral college.[17] Nor has the Court foreclosed such a plan.

Thus, in *Reynolds* the Court quoted from *Gray* as follows:

We think the analogies to the electoral college, to districting and redistricting, and to other phases of the problems of representation in state or federal legislatures or conventions are inapposite. The inclusion of the electoral college in the Constitution, as the result of specific historical concerns, validated the collegiate principle despite its inherent numerical inequality, but implied nothing about the use of an analogous system by a State in a statewide election. No such specific accommodation of the latter was ever undertaken, and therefore no validation of its numerical inequality ensued.[56] 372 U.S., at 378 [83 S.Ct., at

56. 372 U.S., at 378 [83 S.Ct., at 807].

807] 377 U.S. at 574–75, 84 S.Ct. at 1388. The Court in *Reynolds,* however, omitted from the *Gray* quotation footnote 10 that qualifies the word "conventions." The footnote was not repeated in *Reynolds* because not pertinent there, but it is pertinent to this case. It reads:

10. We do not reach here the questions that would be presented were the convention system used for nominating candidates in lieu of the primary system.

372 U.S. at 378, 83 S.Ct. at 807. Though the disclaimer no doubt has reference to a state convention system for nominating state candidates, all the more it encompasses a convention system for nominating candidates for President and Vice-President; for while state action is involved in such nominations, *Georgia,*

---

14. Gray v. Sanders, *supra*; Davis v. Mann, *supra.*

15. Gray v. Sanders, *supra.*

16. The Court in rejecting the philosophy underlying the electoral college as justification for diluting votes cast in heavily populated state legislative districts, stated:

Passage of the Fifteenth, Seventeenth, and Nineteenth Amendments shows that this conception of political equality be-

longs to a bygone day, and should not be considered in determining what the Equal Protection Clause of the Fourteenth Amendment requires in statewide elections.

Gray v. Sanders, *supra* n. 8.

17. The exception is that if there is not a majority vote in the electoral college for any of the candidates, then the election is to be made by the House of Representatives under the provisions of Article XII of the Constitution.

*supra,* a national nominating convention is the instrumentality of the action. In this situation we think the party may resort to the Article II analogy in apportioning 54% of the delegates without infringing the Equal Protection Clause. The analogy is permissible not merely because it has constitutional status in national elections, but because in the context of a national party nominating process it has independent rationality to support its use.

■ In Irish v. Democratic-Farmer-Labor Party of Minnesota, 287 F.Supp. 794, 805 (D.Minn.1968), the court noted the function of a political party in the United States:

> [A] primary function of a political party in a democracy is the direction and control of the struggle for political power among men who may have contradictory interests and often mutually exclusive hopes of securing them. This the parties do by institutionalizing the struggle and emphasizing positive measures to create a strong and general agreement on policies.

In the arena of Presidential politics, the primary function of a national party convention, as suggested by the *Irish* court, is to select among a field of available persons Presidential and Vice-Presidential candidates most competent to perform the duties of office, yet capable of attracting a sufficient number of popular votes to carry the requisite number of States in the election. This process of sorting and unification requires a judgment exercised toward maintaining and enlarging party appeal on a national scale.[18] In making this judgment the Democratic National Committee has decided to allot to the States 46% of the delegates to the 1972 convention on the basis of prior party strength, and, except for the 16 allotted to the territories, to allot the remaining 54% to the States under the electoral college standard of distribution. Except for the number attributed to Senators the electoral college standard is itself one of state population, which of course includes the party strength. Appellees do not demonstrate that the admixture of representation in the convention thus accomplished would bring about a dilution or debasement, violative of the Equal Protection Clause, of the vote of any qualified voter in the 1972 election for President and Vice-President, or would invidiously deprive any qualified voter of a legal right to greater representation in the convention than is accorded by the Committee plan.[19] Moreover, the plan cannot be held on the basis of any data submitted to the court to concentrate power in the convention on so unrepresentative a basis as to cause the candidates to fail to give the electorate an opportunity, insofar as the nominating process is involved, to govern themselves through the exercise of the right to vote. We accordingly hold that the Committee plan would not deprive any person by state action of the equal protection of the laws.

18. *See* Note, One Man, One Vote and Selection of Delegates to National Nominating Conventions, 37 U.Chi.L.Rev. 536, 552–556 (1970). *Compare* Bellamy, Applicability of Fourteenth Amendment to the Allocation of Delegates to the Democratic National Convention, 38 Geo.Wash.L.Rev. 892 (1970).

19. In a number of situations the Supreme Court has permitted exceptions to the one person, one vote formula. In Gordon v. Lance, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed. 2d 273 (1971), some deviation was allowed in respect to incurring bonded indebtedness and certain tax increases; in Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), and Burns v. Richardson, *supra,* exception was allowed in the composition of a state legislature by the use of multi-member districts; and it was allowed in the election of a county board of supervisors in Abate v. Mundt, *supra.* Although we hold that by reason of the nature of a national party convention the one man, one vote standard is not required to be followed in its composition, the above cases demonstrate other situations in which it has not been required when deviation was incident to the effectuation of some rational policy.

## IV

As to the 16 delegates distributed among the territories, aside from the *de minimus* argument, we uphold it as an appropriate recognition of the interest of the territorial citizens in who are to be the candidates for their President and Vice-President, notwithstanding they have no vote in the election.

We are unable to accept the ruling of the District Court that the apportionment formula adopted by the Committee is discriminatory, without rational basis, and unconstitutional, and that the appropriate constitutional method of apportionment is a formula based on the number of Democratic voters voting in one or more immediately preceding Presidential elections.

Reversed and remanded with directions that the motion of defendants in the District Court for summary judgment be granted.

Bazelon, Chief Judge, and Robb, Circuit Judge, filed dissenting opinions.